**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov**

_____
                                                    )
**In re:**                                      )          **Chapter 11**
                                                    )
**SUMMIT FINANCIAL CORP.,**    )          **Case No. 18-13389-RBR**
                                                    )
         **Debtor.**                         )
_____)


**OBJECTION OF BANK OF AMERICA, N.A., TO DEBTOR'S
MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL**

Bank of America, N.A., as agent ("Agent") for itself and BMO Harris Bank N.A. ("BMO", together with Agent, the "Lenders"), objects to the Debtor-in-Possession's Emergency Motion for Entry of an Order (1) Authorizing Use of Cash Collateral; (2) Granting Adequate Protection; and (3) Scheduling a Final Hearing (Docket No. 8) (the "Motion").

In summary, the Debtor Summit Financial Corp. (the "Debtor") cannot meet its burden of proof under sections 361 and 363(c)(2) of Title 11 of the United States Code (the "Bankruptcy Code") to establish that Agent's security interests in property of the bankruptcy estate are adequately protected. The Debtor maintains that an "equity cushion" in the collateral securing Agent's claim is adequate protection of Agent's interests. However, as the evidence in this case will demonstrate, no cushion exists that is sufficient to provide adequate protection. Moreover, as is clear from the Debtor's past financial performance and its projections for the near term in Chapter 11, any supposed cushion will erode rapidly over time. And because any dollar of cash collateral that the Debtor spends will not be replaced with an asset that is worth at least one

dollar, replacement liens alone are not sufficient to provide adequate protection.   Therefore, the Debtor should not be permitted to use cash collateral except with the consent of Agent.

## I.   <u>Factual and Procedural Background</u>

Prior to its decision to discontinue purchasing new consumer loans on or about March 2, 2018, the Debtor was engaged in the business of purchasing, funding and servicing consumer loans used to purchase automobiles in the State of Florida.   The Debtor is managed by Alvin Wheeler, who is President and a Director ("<u>A. Wheeler</u>"); David Wheeler, who is Secretary and a Director ("<u>D. Wheeler</u>"); and Scott Wheeler, who is a Director ("<u>S. Wheeler</u>").   All of the equity interests in the Debtor are owned by A. Wheeler, D. Wheeler, and S. Wheeler.

Agent, the Lenders and the Debtor are parties to a Third Amended and Restated Loan and Security Agreement dated as of February 14, 2017 (as amended from time to time, the "<u>Loan Agreement</u>"), pursuant to which the Lenders made revolving credit loans to, and extended other financial and credit accommodations to or for the benefit of, the Debtor.   Pursuant to Section 14 of the Loan Agreement, Agent is authorized to act as agent for each Lender with respect to, among other things, prosecution of enforcement actions and collection of the debt incurred by the Debtor under the Loan Agreement.   A true and correct copy of the Loan Agreement is attached to the Declaration of Kevin W. Corcoran Regarding Pre-Petition Loan Documents (filed at Doc. No. 18) (the "<u>Corcoran Declaration</u>") at Exhibit 1.

To secure the payment and performance of the Obligations under (and as defined in) the Loan Agreement, the Debtor granted to Agent, for the ratable benefit of Lenders, a first priority continuing security interest in and lien upon all or substantially all of the Debtor's assets,

including, without limitation, all accounts, inventory, contracts, loan agreements, installment sale contracts, notes and other forms of obligations, chattel paper, documents, instruments, letter-of-credit rights, supporting obligations, certificates of title, certificates of origin, general intangibles, goods, equipment, investment property, computer hardware and software, money, cash, cash equivalents, tax refunds, securities, deposit accounts, commercial tort claims, books and records, and all products and proceeds of any of the foregoing (collectively, and as more particularly defined in the Loan Agreement, the "Collateral").  Agent perfected its security interests in the Collateral by, among other things, filing UCC-1 financing statements in the State of Florida.  See Corcoran Declaration at Exhibit 10.

The Loan Agreement was amended five times, primarily to extend the termination date thereof.  True and correct copies of the five amendments to the Loan Agreement (collectively, the "Amendments") are attached to the Corcoran Declaration at Exhibits 2, 4, 5, 7 and 8.

The amount of money that the Debtor was entitled to borrow from the Lenders depended upon the quantity, quality and value of the Collateral at the time of the requested borrowing. Acting through an authorized officer, the Debtor would submit Borrowing Base Certificates to Agent in which the Debtor would certify the quantity, quality and value of the Collateral.  Then, based upon formulas in the Loan Agreement, Lenders would calculate how much the Debtor was entitled to borrow, assuming that no default or event of default existed.

In or about September 2017, an audit by Agent discovered that the Debtor had been materially misrepresenting the quality and quantity of consumer loans that served as Collateral, thereby inducing the Lenders to lend more than the Debtor was entitled to borrow under the Loan

Agreement.  From time to time, a consumer vehicle loan owned by the Debtor would go into default, the unpaid balance would be accelerated, and the vehicle would be repossessed and sold at auction.  In these instances, the Debtor would take the proceeds of the vehicle that had been sold, apply them to past due monthly payments on the loan (and even "prepay" future monthly payments), and treat the loan as current and performing for purposes of reporting to Agent.  In reality, the consumer had stopped paying and the consumer's vehicle had been repossessed and sold, the Debtor knew that the consumer would never make another payment, and any remaining balance after application of the sale proceeds was unsecured and should have been charged off.  According to Agent's auditor, these practices appeared to have occurred throughout 2017 and involved several million dollars of consumer loans that should have been charged off, but that were being reported to Agent as current and performing loans.

The Debtor's management subsequently acknowledged that its books, records and reporting to Agent were not accurate.  Prior to discovery by Agent's auditor in September 2017, the Debtor's management had known about, but had not disclosed to Agent, such misstatements.  According to A. Wheeler, the Debtor had hoped to be able to gradually adjust its books and records to fix the problem before the end of 2017.

The Debtor's practice of treating consumer loans as current and performing, even though the debt had been accelerated and the vehicle had been repossessed and sold, had numerous consequences under the Loan Agreement and created numerous defaults and Events of Default (as defined in the Loan Agreement).  In essence, by treating consumer loans as current when the vehicle had been repossessed and sold, the Debtor inflated the quantity, quality and value of the

Collateral for purposes of borrowing calculations.  In addition, by avoiding charge-offs of unsecured deficiency balances, the Debtor misrepresented its profitability and financial performance and was able to hide operating losses.  After acknowledging the Debtor's responsibility for materially misstating the quantity and quality of the Collateral in reporting to Agent, A. Wheeler made equity contributions or subordinated loans to the Debtor in the approximate aggregate amount of $2.5 million in an effort to enhance liquidity and partially mitigate the damage that had been caused.

The amount that the Debtor was entitled to borrow under the Loan Agreement was governed in part by a Collateral Performance Index, which served to decrease borrowing availability when the Collateral did not perform (i.e., when charge-offs occurred).  After applying the corrected ratio of charge-offs, the advance rate declined, and the Debtor had borrowed more money than it was entitled to borrow, resulting in an "Overadvance" that exceeded $9 million.  In the Amendments, the Debtor acknowledged in writing that Events of Default occurred and continued to exist as a result of the Debtor's failure to (a) properly apply certain "repo payments" in accordance with the provision of the Loan Agreement and the ensuing noncompliance with the covenants set forth in Sections 9.23 (Interest Coverage Ratio), 9.22 (Leverage Ratio Coverage) and 9.22 (Loan Loss Reserve) of the Loan Agreement, resulting in separate Events of Default under Section 11.1(C) of the Loan Agreement, and (b) report the Advance Rate pursuant to Section 6.7(B) of the Loan Agreement, resulting in (i) separate Events of Default under Section 11.1(C) of the Loan Agreement and (ii) an Overadvance that the Debtor failed to repay immediately in violation of Section 11.1(A) of the Loan Agreement.

In 2018, Agent, the Debtor, and the Wheelers engaged in good faith discussions regarding a forbearance agreement or restructuring plan that would allow the Debtor to continue as a going concern.  The Debtor retained Greenberg Traurig as restructuring counsel and Phoenix Management Services ("Phoenix") as its financial advisor to assist with expense reductions, financial projections and business plans.  Meanwhile, the Loan Agreement was set to terminate and mature by its terms on February 15, 2018.  In order to provide time for discussions, the Amendments were executed in order to extend the "Stated Termination Date" under the Loan Agreement.   After several weeks of intensive negotiations, on February 28, 2018, the Debtor and the Wheelers scheduled a conference call with the Debtor's attorneys, Phoenix, the Lenders, and attorneys for the Lenders.  On and after that call, the Debtor informed the Lenders that the financial models created by management and Phoenix showed that the Debtor would not be able to eliminate the Overadvance within a period of time that would be acceptable to the Lenders, and therefore, the Debtor would need to wind down its operations.

Members of the Wheeler family are officers and directors of the Debtor, own equity interests in the Debtor, hold subordinated promissory notes issued by the Debtor, own interests in other entities that do business with the Debtor, and have caused the Debtor to issue subordinated promissory notes to their family and friends.  In light of conflicts of interest that impaired the ability of the Wheelers to make decisions under the circumstances, and based upon the advice of the Debtor's experienced professional advisors, the Debtor decided in early March of 2018 to appoint Brian Gleason from Phoenix as Chief Restructuring Officer.  Mr. Gleason is an experienced restructuring professional who knows how to conduct an orderly wind down in a

manner that maximizes value and respects the priority of secured, unsecured and subordinated claims under the law.  Mr. Gleason was appointed as Chief Restructuring Officer by board resolutions dated March 12, 2018, with authority, among other things, to "review, authorize and approve all material expenditures and cash disbursements" of the Debtor.

Because the Debtor did not have the financial ability to continue as a going concern, the Chief Restructuring Officer began to cut operating expenses and questioned payments that were being made by the Debtor to and for the benefit of members of the Wheeler family.  For example, the owner of the building where the Debtor operates is a limited liability company owned by A. Wheeler and his wife.  That entity had not charged the Debtor rent for almost one year prior to March 2018.  Ignoring the financial crisis faced by the Debtor, A. Wheeler demanded that the Debtor commence paying rent during the wind down at a rate higher than the rent last paid by the Debtor in 2016, which demand was resisted by the Chief Restructuring Officer and the Lenders. In addition, the Chief Restructuring Officer questioned whether some of the members of the Wheeler family who were receiving six-figure salaries were necessary and providing value to the Debtor and recommended that the employment of at least one of them be terminated.  Management of the Debtor did not appreciate the Chief Restructuring Officer's efforts to cut expenses, and in particular, insisted that payments to and for the benefit of management's friends, family and related entities continue to be made.   Then, on March 19, 2018, less than one week after the Chief Restructuring Officer had been appointed, the board of directors of the Debtor, which consists of A. Wheeler, D. Wheeler and S. Wheeler, abruptly fired all of the Debtor's experienced advisors.  By written termination letters, the Debtor fired its

7

restructuring counsel at Greenberg Traurig and also terminated the employment of the Chief Restructuring Officer.   On March 16, 2018, the last Amendment expired, the Stated Termination Date occurred, and more than $100 million in debt became immediately due and payable by the Debtor.

After firing Greenberg Traurig and the Chief Restructuring Officer, the Debtor requested a face-to-face meeting with Agent and the Lenders.  Agent and the Lenders agreed to meet, and that meeting was scheduled for Monday, March 26, 2018, in Atlanta, Georgia.

Prior to the meeting that the Debtor had requested, and with absolutely no advance warning or notice, on Friday, March 23, 2018 (the "Petition Date"), the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code.  As of the Petition Date, the Debtor was indebted to the Lenders pursuant to the Loan Agreement for unpaid Revolving Loans (as defined in the Loan Agreement) in the approximate principal amount of $101,382,098 and Letter of Credit Obligations (as defined in the Loan Agreement) in the principal amount of $300,000.00, exclusive of accrued interest, costs, attorneys' fees and other charges (all of the foregoing indebtedness, together with all interest, attorneys' fees, and other expenses heretofore or hereafter accruing or chargeable to the Debtor in connection therewith, is hereinafter called the "Pre-Petition Debt").  See Corcoran Declaration at ¶ 5.

The Debtor filed the Motion on March 26, 2018, seeking authority to use, consume, sell, or otherwise dispose of cash collateral in connection with its pending Chapter 11 case. The Debtor asserts in the Motion that the Collateral has a gross or book value of $136,000,000 and that "the Secured Creditors enjoy an equity cushion, such that their collateral is fully protected."

(Motion at ¶ 19.) Thus, the adequate protection that is offered by the Debtor in the Motion is an alleged equity cushion based upon the alleged gross or book value of the Collateral on the Petition Date.

## II.    Argument and Citation of Authority

Pointing to the gross amount of consumer loan Collateral as shown on its books, the Debtor maintains that a substantial equity cushion exists because the gross amount of the Collateral exceeds the amount of the Pre-Petition Debt.  The Debtor argues that, notwithstanding the Debtor's ongoing losses and continued erosion of the Collateral, Agent's interests in the Collateral are adequately protected.  However, as set forth more fully below, gross or "book" value is an inappropriate valuation standard to be used in the context of measuring adequate protection for the Debtor's use of cash collateral.  Using a proper methodology, the value of the Collateral is insufficient to afford adequate protection of the property interests of Agent. Therefore, the Debtor's request to use cash collateral without the consent of Agent should be denied.

### A.    To Authorize Use of Cash Collateral, Agent's Interests in the Collateral Must Be Adequately Protected.

A debtor may not use cash collateral unless each entity that has an interest in the cash collateral consents or the court, after notice and a hearing, authorizes such use in accordance with the provisions of section 363.  11 U.S.C. § 363(c)(2).  Because cash collateral, once spent, is impossible to recover, the Bankruptcy Code strictly conditions a trustee's or debtor-in-possession's right to use cash collateral of an objecting creditor upon the provision of adequate protection.  11 U.S.C. § 363(c)(2)(B).  Although the Bankruptcy Code does not define adequate

9

protection, it lists examples in section 361, which include periodic cash payments or replacement liens. Regardless of the form that adequate protection takes, the secured creditor is entitled to receive the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(3).

The importance of ensuring adequate protection of Agent and Lenders' interests before authorizing the Debtor to use cash collateral cannot be overstated. Though a creature of statute, adequate protection is rooted in the Fifth Amendment's prohibition against the taking of private property without just compensation. United States v. Security Industrial Bank, 459 U.S. 70, 75, 103 S. Ct. 407, 74 L. Ed. 2d 235 (1982) ("The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation."). Further, it is unquestionable that security interests are "property rights" protected by the Fifth Amendment. See, e.g., In re George Ruggiere Chrysler-Plymouth, Inc., 727 F. 2d 1017, 1019 (11th Cir. 1984) (citing Wright v. Union Central Life Ins. Co., 311 U.S. 273, 61 S. Ct. 196, 85 L. Ed. 184 (1940)). Accordingly, the Court cannot allow Agent's interests in the Collateral to be diminished by the Debtor's use of cash collateral while under the protection of the Bankruptcy Code's automatic stay. Although the concept of adequate protection is flexible, the requirement that adequate protection be provided is uncompromising. See In re Magnus, 50 B.R. 241, 243 (Bankr. D. N.D. 1985) (adequate protection "encompasses the basic constitutional requirement that a creditor's interest in property cannot be in any respect impaired or subjected to increased risk without assurance that the creditor will realize the benefit of its bargain") (emphasis added) (citations omitted).

10

**B.**    **The Debtor Bears the Burden of Proof on Adequate Protection.**

On a motion to use cash collateral, section 363(p) of the Bankruptcy Code imposes upon the debtor the burden of proving that the secured creditor's interest is adequately protected.  See e.g., In re 5877 Poplar, L.P., 268 B.R. 140, 145 (Bankr. W.D. Tenn. 2001);  In re JKJ Chevrolet, Inc., 190 B.R. 542, 547 (Bankr. E.D. Va. 1995), aff'd., 117 F.3d 1413 (4th Cir. 1997);  In re Colonial Center, Inc., 156 B.R. 452, 463 (Bankr. E.D. Pa. 1993); Matter of Cropper Co., 35 B.R. 625, 633 (Bankr. M.D. Ga. 1983);  In re Sheehan, 38 B.R. 859, 863-864 (Bankr. D.S.D. 1984). Courts differ, however, on the standard of proof that the debtor must carry on its motion.  Some courts have required proof by "clear and convincing evidence."  In re O.P. Held, Inc., 74 B.R. 777, 784 (Bankr. N.D.N.Y. 1987) (citing In re Leavell, 56 B.R. 11, 13 (Bankr. S.D. Ill. 1985)); In re Sheehan, 38 B.R. 859, 868 (Bankr. D.S.D. 1984).   Others require proof by a "preponderance of the evidence."  See In re Glasstream Boats, Inc., 110 B.R. 611, 613 (Bankr. M.D. Ga. 1990); In re McCombs Properties VI, Ltd., 88 B.R. 261, 268 (Bankr. C.D. Calif. 1988).

While there does not appear to be any controlling authority in the Eleventh Circuit, this Court should apply the clear and convincing evidence standard in this case in determining whether the Debtor has met its burden of proof.  As noted by one Florida bankruptcy court:

> Congress' enacting § 363 of the Code gave a special treatment to "cash collateral" for the obvious reason that cash collateral is highly volatile, subject to rapid dissipation and requires special protective safeguards in order to assure that a holder of lien on "cash collateral" is not deprived of its collateral through unprotected use by the Debtor.

Matter of Mickler, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981).  Similarly, courts have recognized that "[t]he debtor's burden is greater in succeeding in a cash collateral motion than in

11

withstanding a § 362(d) motion [to lift the automatic stay]." In re 1606 New Hampshire Ave. Assocs., 85 B.R. 298, 309 (Bankr. E.D. Pa. 1988).  As recognized by these courts, Congress has provided special protection for a secured creditor's interest in cash collateral as opposed to other types of collateral, indicating that courts should apply a stricter standard of proof than may by applied in other contested matters. See In re Stacy Farms, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987) ("[i]t is axiomatic that cash collateral is special in nature and must be well protected"); In re Berens, 41 B.R. 524 (Bankr. D. Minn. 1984) (definition of adequate protection in the context of section 363 is considered to be uncompromising, in contrast to the standard under other sections of the Bankruptcy Code, because  the debtor proposes to consume and use up cash collateral in its entirety); In re Polzin, 49 B.R. 370 (Bankr. D. Minn. 1985) (same).  Unlike the depreciation of tangible assets, once cash collateral is spent, it can never be recovered, which heightens the danger of injury to the secured creditor and increases the importance of protecting against such injury.

To ensure that Agent receives the constitutionally mandated protection of its property interests, the Debtor should be required to show by clear and convincing evidence that Agent's interests in the Collateral will be adequately protected if the Debtor is permitted to use cash collateral.  To satisfy this clear and convincing evidence standard, the Debtor must present evidence of adequate protection which

> leaves no substantial doubt in your mind. It is proof that establishes in your mind, not only [that] the proposition at issue is probable, but also that it is highly probable.  It is enough if the party with the burden of proof establishes his claim beyond "any substantial doubt"; he does not have to dispel every "reasonable doubt."

In re Diviney, 211 B.R. 951, 961 (Bankr. N.D. Okla. 1997) (quoting 4 L. Sand, et al., Modern

Federal Jury Instructions  ¶ 73.01 at 73-16 (1997)), <u>aff'd</u>, 225 B.R. 762 (10th Cir. BAP 1998), <u>abrogated by</u> <u>In re Johnson</u>, 211 B.R. 951 (10th Cir. 2007) (specifically regarding the burden of proof to establish a willful violation of the automatic stay in light of Supreme Court precedent).

Regardless of whether a "clear and convincing" or "preponderance of the evidence" standard applies, the Debtor cannot meet its burden of proof with unsubstantiated lay testimony based upon the gross or "book" value of its assets or mere hopeful predictions. <u>See</u> <u>Bankwest, N.A. v. Todd</u>, 49 B.R. 633, 635  (D. S.D. 1985) ("In the case at hand, debtors presented no documentary evidence in support of the values they assigned to the property secured to Bank. Indeed, it appears from the record in this case that the figures contained on debtors' four exhibits are nothing more than debtors' predictions.").  To prove adequate protection exists, the Debtor "must go beyond simply estimating what they hope they can harvest and what they hope the market will bring  for it." <u>Bankwest</u>, 49 B.R. at 635.  Rather, the Debtor must support its allegations with objective and convincing evidence that a meaningful equity cushion exists that will not be eroded by the Debtor's ongoing losses.  The Debtor has not, and cannot, provide such "clear and convincing" evidence.  Even using the lesser standard of "preponderance of the evidence," the Debtor has presented nothing more than "book value" and, therefore, is not entitled to use cash collateral without the consent of Agent.

**C.**      **<u>Net Liquidation Value is the Proper Valuation Standard.</u>**

Generally, the measure of the adequate protection required is determined by the extent of the anticipated or actual decrease in value of the secured creditor's collateral during the bankruptcy case.  <u>See, e.g.</u>, <u>In re First South Savings Associates</u>, 820 F.2d 700, 710 (5th Cir.

1987). Regardless of how desperately the Debtor may need cash collateral to sustain its business, the test is whether the value of Agent's interests in the Collateral will be diminished by the Debtor's use of this Collateral.  See, e.g., In re Goode, 235 B.R. 584, 589 (Bankr. E.D. Tex. 1999) (citing In re Glasstream Boats, Inc., 110 B.R. 611, 613 (Bankr. M.D. Ga. 1990)).  See also In re Certified Corp., 51 B.R. 768, 771 (Bankr. D. Haw. 1985) (the protection to be afforded to secured creditor to permit debtor's use of cash collateral must result in the indubitable equivalent of the secured creditor's interest in the property).

In agreeing to advance funds to the Debtor pursuant to the Loan Agreement, Agent bargained for certain rights, including the right to foreclose upon its security interests in the Collateral if the Debtor defaulted.  As discussed above, these rights as a secured creditor are protected by the Fifth Amendment and cannot be taken without compensation.  Upon the Debtor's filing for bankruptcy relief, the automatic stay has barred Agent from exercising these constitutionally protected rights.  Now, in addition to prohibiting Agent from exercising its rights as a secured creditor, the Debtor proposes to use cash collateral.  The adequate protection required by the Fifth Amendment and section 361 must guard against a decline in the value of Agent and Lenders' interest in the Collateral during the pendency of the bankruptcy case while the automatic stay is in effect.  In other words, Agent and Lenders should be no worse off after the Debtor uses cash collateral than if they were permitted to exercise their state law rights today. If the Debtor cannot provide this protection for Agent's interests in the Collateral, the Debtor is not entitled to use cash collateral without the consent of Agent.

The question of whether the protection proposed for the use of cash collateral will be

sufficient necessitates a determination of the value of the secured creditor's interest in its collateral and whether any proposed use of the cash collateral threatens that value, "absent the additional protection that the cash collateral would provide." In re George Ruggiere Chrysler-Plymouth, Inc., 727 F. 2d 1017, 1019 (11th Cir. 1984). In valuing the creditor's interest in the property for purposes of measuring adequate protection, there is no set standard of valuation. Instead,

> [v]aluation in a given case depends on that calculation which properly reflects a secured creditor's true state of protection. . . . The "true state of protection" depends largely upon such factors as the nature of the debtor's business, general prospects for reorganization, the time lapsed since the filing of the petition, and the existence, or lack of, an equity cushion.

In re O'Quinn, 98 B.R. 86, 89 (Bankr. M.D. Fla. 1989) (internal quotations omitted) (citing In re Phoenix Steel Corp., 39 B.R. 218, 224 (D. Del.1984)). The Debtor insists that Agent and Lenders are oversecured and that a substantial equity cushion alone is enough to adequately protect Agent's interest in the Collateral. In making this argument, the Debtor produces no appraisal or expert testimony, but relies solely upon the gross or "book" value of the Collateral. Book value, however, is not an appropriate standard for measuring adequate protection of a secured creditor's interests when a debtor proposes to use cash collateral. Book value does not take into account the value of the collateral to a secured party that is allowed to exercise its state law remedies. Because the focus of adequate protection is on protecting the *creditor's interest* in the collateral, only net liquidation value—the amount that Agent would realize if it foreclosed upon or collected the Collateral in a commercially reasonable manner, after deducting disposition costs—will be the appropriate standard. Only by the use of such a valuation standard

can the Court be assured that Agent's constitutionally protected interests will not be diminished by the Debtor's use of cash collateral. See Matter of Melson, 44 B.R. 454, 457 (Bankr. D. Del. 1984) (equity cushion provides adequate protection when the creditor can foreclose upon the collateral and realize an amount sufficient to fully recover the balance of the obligation); In re 5-Leaf Clover Corp., 6 B.R. 463, 466 (Bankr. S.D. W. Va. 1980) (equity cushion provides adequate protection so long as creditor may foreclose upon the collateral and realize an amount sufficient to fully cover the balance due on the debt).  As this Court (and at least one other bankruptcy court in Florida) has recognized, net liquidation value is an appropriate valuation standard in various contexts. See Matter of Neise, 31 B.R. 409, 414 (Bankr. S.D. Fla. 1983) ("[I]t is appropriate to look to liquidation value to determine whether equity exists."); see also In re O'Quinn, 98 B.R. 86, 89 (Bankr. M.D. Fla. 1989) (collateral appraised at liquidation value for adequate protection purposes).

Net liquidation value also has been used as the proper valuation standard for purposes of measuring adequate protection in other courts. See, e.g., In re Sharon Steel Corp., 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) ("[Creditor] asserts that liquidation value is the appropriate yardstick by which to measure the value of the Debtor's assets. We agree"); In re T. H. B. Corp., 85 B.R. 192, 195-196 (Bankr. D. Mass. 1988) ("We conclude that an orderly liquidation value is the proper standard of valuation");  In re Polzin, 49 B.R. 370, 373 (Bankr. D. Minn. 1985) (adequate protection valuation must take foreclosure costs into account).

From another perspective, because the purpose of adequate protection is to prevent an unconstitutional taking of Agent's property as a result of the Debtor's use of cash collateral in an

16

unsuccessful attempt to reorganize, any alleged equity cushion should be measured using the net amount which Agent could realize at a foreclosure sale or sales or through collection of the consumer loan Collateral under state law.  See  In re George Ruggiere Chrysler-Plymouth, Inc., 727 F. 2d 1017, 1019-20 (11th Cir. 1984) (purpose of adequate protection is to compensate the creditor and protect from risk the present value of the creditor's interest in property). As one Court has noted, "creditors are not in the business of selling at retail and have not shown the capacity to do so.  In this regard, the Court stated that the creditors cannot reasonably be said to "stand in the shoes' of the [debtor], so as to justify a retail valuation.  "  In re Coates, 180 B.R. 110, 114 (Bankr. D.S.C. 1995) (quoting Grubbs v. National Bank of South Carolina, 114 B.R. 450, 452 (D.S.C. 1990)).  The Debtor's proffer will attempt to show that the Lenders are amply secured on a gross or "book" value basis, but the value of the Collateral using the correct approach is much, much less.  Hence, with each dollar of cash collateral spent to generate an asset that is worth less than one dollar, the Lenders will suffer an additional loss, and Agent's interests in the Collateral are not adequately protected.

      **D.**      **Even if an Equity Cushion Existed, It is Not Sufficient to Provide Adequate Protection.**

Even if an equity cushion existed, with the significant risk of losses continuing to mount each day of operation that current management remains in control, any such cushion would disappear so rapidly that Agent's interests will not be adequately protected.  The existence of an equity cushion is but one factor to be examined in the adequate protection analysis. Matter of Certified Mortg. Corp., 19 B.R. 369, 370 (Bankr. M.D. Fla. 1982).  See also In re Colrud, 45 B.R. 169, 178 (Bankr. D. Alaska 1984) ("equity cushion will suffice as adequate protection

17

provided that there are no other factors which weigh more heavily in the creditor's favor"). Among other factors to be considered are the size of the cushion, the rate of erosion of the cushion, and whether periodic payments are to be made to prevent or mitigate its erosion.  In re Rorie, 98 B.R. 215, 221 (Bankr. E.D. Pa. 1989).   See also In re Dynaco Corp., 162 B.R. 389, 394 (Bankr D.N.H. 1993) (relevant question is not whether equity cushion exists at any particular time, but whether a "motion picture" of cycling inventory demonstrates the secured creditor's interest is exposed to substantial danger over the long term).

Recognizing that the mere existence of an equity cushion is insufficient, courts reject equity cushions as adequate protection when collateral is eroding quickly or prospects for reorganization are slim.  See In re Sharon Steel Corp., 159 B.R. 165 (Bankr. W.D. Pa. 1993) ($40.9 million equity cushion did not constitute adequate protection where continued operation would result in rapid erosion of collateral and successful reorganization seemed unlikely);  In re C.F. Simonin's Sons, Inc., 28 B.R. 707 (Bankr. E.D.N.C. 1983) (court severely restricted debtor's use of cash collateral due to high degree of uncertainty surrounding plan of reorganization); Matter of Schaller, 27 B.R. 959 (W.D. Wis. 1983) (17% equity cushion insufficient to provide adequate protection where it was being eroded by interest charges accruing each day). Creditors should not be made to stand by idly until the equity cushion evaporates completely.  In re 5-Leaf Clover Corp., 6 B.R. 463, 467 (Bankr. S.D. W. Va. 1980) ("To require the creditor to wait until the collateral's value equals the lien attaching to it before foreclosure and sale is permitted does not adequately assure the creditor that the debt can be fully recovered").

In addition, several courts also have found a lack of adequate protection of cash collateral

where the debtor was unable to provide accurate and trustworthy information to the secured creditor.  In <u>re O. P. Held, Inc.</u>, 74 B.R. 777, 783 (Bankr. N.D.N.Y. 1987), the court held that the debtor failed to carry its burden of demonstrating that the creditor's interests would be adequately protected when it failed to produce "the type of projection[s] a prudent businessman or banker is willing to act upon."  <u>See also</u> <u>In re Glasstream Boats, Inc.</u>, 110 B.R. 611, 614 (Bankr. M.D. Ga. 1990) (both the court and the secured creditor are entitled to know, as a sum certain, the amount and value of the collateral on any given day in order to know whether the collateral was depreciating).   Here, the Debtor has admitted, in the Amendments and otherwise, that it materially overstated the quality and quantity of the Collateral in reporting to Agent, thereby inducing the Lenders to lend millions of dollars more than they should have.

The Debtor is not profitable and is losing money. As stated by the Court in <u>In re Sharon Steel Corp.</u>, 159 B.R. 165 (Bankr. W.D. Pa. 1993), in denying a motion to use cash collateral, "Losses can quickly mount, not only eroding any equity cushion for the objecting Lenders, but also allowing the employees and post-petition unsecured creditors to become unsuspecting and unwilling contributors to the Debtor's unfortunate situation."  As in <u>Sharon Steel</u>, given the rapidly deteriorating financial condition of the Debtor, a nominal equity cushion alone does not provide adequate protection of Agent's interests in the Collateral.

###    E.    If This Court is Inclined to Permit Use of Cash Collateral for a Short Period of Time, A Fair Adequate Protection Package Must Be <u>Granted to Agent and the Lenders.</u>

Because the Debtor filed a chapter 11 petition with no warning, notice or advance planning, Agent and the Lenders were not able to attempt to negotiate a cash collateral

arrangement that would prevent the Court from needing to rule on a contested cash collateral motion in the early days of this chapter 11 case. Since the Debtor cannot meet its burden of proof, the Court should deny the Motion to the extent that it seeks relief without the consent of Agent. However, if the Court is inclined to permit use of cash collateral in a limited amount for a short period of time, Agent and the Lenders request a fair adequate protection package that includes, among other things, the following:

1. **Short Duration.** Considering the required notice periods in Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Rules"), the Court should permit use of cash collateral on an interim basis only through a date during the week of April 16, 2018, that is available for the Court to have a subsequent hearing.

2. **Budget Compliance.** The Debtor should be required to comply with and adhere to a detailed budget for use of cash collateral. Rule 4001(b)(2) requires budget compliance to ensure that the Debtor only spends funds "necessary to avoid immediate and irreparable harm" pending a final hearing.

3. **Adequate Protection Liens.** Agent should be granted adequate protection liens on the assets of the Debtor to secure any diminution in the value of Agent's interests in the Collateral during the case. Since the Debtor stopped purchasing new consumer loans before the Petition Date and should not be permitted to re-start its lending business for reasons described below, these adequate protection liens have limited effect in providing adequate protection. But liens on new collateral that is generated post-petition, if any, is a standard form of adequate protection that should be provided to Agent.

4. **Right to Suspend Use of Cash Collateral.** The value of the Collateral and financial performance of the Debtor may change rapidly and dramatically. If the Debtor's actual cash collections fall below 90% of the amount shown in the budget for any week, or if the Overadvance increases during the case, then Agent should have the right to file a notice with the Court to raise the issue of whether continued use of cash collateral is appropriate. The Debtor should have the right to respond to that notice within three days. If there is a timely dispute, then the Debtor may continue using cash collateral until the Court can hear and decide it. These proposed rules protect Agent and the Lenders by giving Agent the right to file a notice of suspension if cash collections or the quantity or quality of the Collateral decline precipitously, give the Debtor the right to promptly dispute the allegations of Agent, and ultimately defer to the Court's authority if the dispute cannot be resolved by consent.

20

**5.    Access to Premises and Financial Reporting.**  The Debtor should be required to provide access to its premises, books and records to Agent and Agent's consultants and advisors during normal business hours.  The Debtor also should be required to provide to Agent the same collateral and financial reporting as it was required to provide prior to the Petition Date, as well as a weekly actual-to-budget report.    Real-time transparency, openness and disclosure are necessary in order for Agent to be able to protect its interests and timely seek relief from the Court if necessary.

**6.    Payment of Accrued Interest Without Prejudice.**  The Debtor should be required to pay interest on the unpaid principal balance of the Pre-Petition Debt, subject to reallocation to principal or disgorgement as a result of a timely and successful challenge to the claims or liens of Agent and the Lenders.

**7.    Challenge Deadline.**  Parties in interest should be required to review the loan and perfection documents attached to the Corcoran Declaration (already on file with the Court), and any other relevant loan documents, within a reasonable period of time and to raise any issues with the priority, perfection or validity of the claims and liens of Agent and the Lenders.  A challenge period through the date that is 60 days after the appointment of an official committee of unsecured creditors (the "Committee") would be reasonable, subject to extension by the Court for cause shown.

**8.    No Stockpiling of Cash.**  If aggregate cash collections of Collateral exceed the aggregate amount that the Debtor is entitled to spend under the approved budget, then such excess should be applied to reduce the Pre-Petition Debt.

**9.    No Payments to Insiders.**  At least pending a final hearing, the Debtor should be prohibited from making any payment to any insider of the Debtor other than regular salary owed to D. Wheeler in an amount that does not exceed the amount being paid by the Debtor prior to the Petition Date.

**10.    No Payment of Pre-Petition Unsecured Debt.**  The Debtor should be prohibited from making any payment to any holder of pre-petition unsecured debt with proceeds of Collateral.

**11.    No Starting Up New Lending Practices.**  Prior to the Petition Date, the Debtor decided, in consultation with its counsel Greenberg Traurig and its Chief Restructuring Officer from Phoenix, to stop purchasing new loans and to focus on protecting and preserving its existing assets.  The Debtor did not purchase new loans during the three weeks prior to the Petition Date. If the Debtor was to take one dollar of cash collateral, which is worth one dollar, and purchase a new consumer loan, that loan would be worth less than one dollar immediately after it was made. Taking into account the expense and overhead associated with starting up new lending practices, the loss of value that the bankruptcy estate will suffer if the Debtor tries to

start up a new lending practice will be astronomical.   At least until further consideration of the issue at a final hearing, and until a Committee is appointed, the Debtor should be permitted to use cash collateral only to protect, preserve and maintain its existing portfolio of consumer loans. This limited relief is all that is permitted under Rule 4001(b)(2), which restricts a Debtor's spending to items "necessary to avoid immediate and irreparable harm to the estate" pending a final hearing.

12.     **No Pre-Funding of Legal Fees.**  Pursuant to Rule 6003, the Court will not finally rule on applications to employ counsel for the Debtor for at least 21 days.  No fee applications have been filed or granted by the Court.  Counsel for the Debtor was paid a substantial retainer prior to the Petition Date and there are no unpaid, accrued legal fees at this time.  The Debtor cannot be allowed to use cash collateral over the objection of Agent to "pre-fund" legal fees that have not yet been incurred, billed, reviewed by the United States Trustee or allowed.   There is no need for the Court to consider this issue at an emergency, interim hearing that is required to be focused upon protecting and preserving the value of the Debtor's assets.  All references to legal fees in the budget should be deleted during the interim period.

## III.  Conclusion

The Debtor has asserted that Agent's interests in the Collateral are adequately protected by an alleged equity cushion measured by the gross or "book" value of its assets.  However, considering the purpose of adequate protection, the Court should reject gross value as the valuation standard and instead look to the net liquidation value of the Collateral.  When the value of the Collateral is tested by a net liquidation analysis, the Debtor cannot meet its burden of proof to provide clear and convincing evidence, or even a preponderance of the evidence, that a meaningful equity cushion exists.  Even if a small equity cushion exists, it is ephemeral and will quickly disappear, causing irreparable harm to Agent and the Lenders.  The Debtor should not be permitted to use cash collateral without the consent of Agent.

For all of the foregoing reasons, the Motion should be denied.

Respectfully submitted, this 27th day of March, 2018.

**PARKER, HUDSON, RAINER & DOBBS LLP**


By: _/s/ James S. Rankin, Jr._
      James S. Rankin, Jr.
      Georgia Bar No. 594620
      Michael Sullivan
      Georgia Bar No. 964038
      Applications for Admission _Pro Hac Vice_
      Pending

303 Peachtree Street NE, Suite 3600
Atlanta, Georgia  30308
Phone:  (404) 523-5300
Fax:  (404) 522-8409
E-mail:  jrankin@phrd.com


**LIEBLER, GONZALEZ & PORTUONDO**


By: _/s/ Laudy Luna_
      Laudy Luna
      Florida Bar No. 44544
      Frank P. Cuneo
      Florida Bar No. 123188

Courthouse Tower, 25th Floor
44 West Flagler Street
Miami, Florida 33130
Phone:  (305) 379-0400
Fax:  (305) 379-9626
E-mail:  ll@lgplaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 27, 2018, a true and correct copy of the foregoing OBJECTION OF BANK OF AMERICA, N.A., TO DEBTOR'S MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL  was served via the Court's Case Management/Electronic Case Filing system upon all parties entitled to receive notice in this case pursuant to BLR 9076-1(A), including the following parties:

Douglas J. Jeffrey, Esq.
Law Offices of Douglas J. Jeffrey, P.A.
6625 Miami Lakes Dr. E #379
Miami Lakes, FL 33014

Zach B. Shelomith
Leiderman Shelomith Alexander + Somodevilla, PLLC
2699 Stirling Rd. #C401
Ft. Lauderdale, FL 33312

Bradley S. Shraiberg
Shraiberg, Landau & Page, P.A.
2385 NW Executive Center Drive, Suite 300
Boca Raton, FL 33431

Damaris Rosich-Schwartz
Office of the United States Trustee
51 S.W. 1st Avenue
Suite 1204
Miami, FL 33130

This 27th day of March, 2018.

PARKER, HUDSON, RAINER & DOBBS LLP

By: */s/ Michael Sullivan*
       Michael Sullivan
       Georgia Bar No. 964038
       Application for Admission *Pro Hac Vice*
       Pending

5373434_5