UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:                                    Case No.: 18-13389-BKC-RBR

SUMMIT FINANCIAL CORP.,                   Chapter 11

     Debtor.
_____/

**DEBTOR'S SUPPLEMENT TO (A) MOTION FOR ORDER AUTHORIZING USE OF
CASH COLLATERAL [ECF # 8], AND (B) RESPONSE [ECF # 64]
TO OBJECTION OF BANK OF AMERICA, N.A., TO DEBTOR'S MOTION FOR
<u>ORDER AUTHORIZING USE OF CASH COLLATERAL</u>**

---

**<u>HEARING REQUESTED ON OR BEFORE JULY 25, 2018</u>**

**Debtor-in-Possession requests a hearing on this Supplement, the
Motion and Response (as defined herein) <u>*on or before July 25, 2018*</u>,
because of its immediate need to increase the number of loans it is
underwriting. Failure to increase the number may result in an
irreparable harm to the Debtor-in-Possession's ongoing business
concern, and therefore dim prospects for a successful
reorganization.**

---

Debtor-in-Possession, Summit Financial Corp. ("Debtor"), by and through its
undersigned counsel, submits its supplement to (the "Supplement") (a) *Debtor's Motion for
Order Authorizing Use of Cash Collateral* (the "Motion") [ECF # 8], and (b) *Debtor's Response
In Opposition to* (the "Response") [ECF # 64] *Objection of Bank of America, N.A.* (the
"Objection")*, To Debtor's Motion For Order Authorizing Use of Cash Collateral*. In support of
its Supplement, the Debtor states:

<u>BACKGROUND</u>

***The Debtor and the Nature of its Business***

1.     On March 23, 2018 (the "Petition Date"), the Debtor commenced this case by
filing a voluntary petition for relief under Title 11, Chapter 11 of the United States Code (the

"Bankruptcy Code").    The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. No Trustee has been appointed in this case.

2.    The Debtor is family-owned and has operated successfully for over 34 years. It is in the business of providing financing by purchasing and servicing retail installment sales contracts (consumer vehicle loans) primarily originated at first and second-tiered franchised automobile dealerships and select independent used car dealerships located throughout Florida. The Debtor's business is and has been extremely viable for some 34 years, as it occupies a unique space in the auto loan community, carefully making what are commonly known as "sub-prime" loans.

3.    The Debtor's primary creditors are Bank of America, N.A., and BMO Harris Bank, N.A. (collectively, "BOA" or the "Banks").

### Indebtedness Amount, Portfolio Value and M2M Valuation as of the Petition Date and as of Mid-June 2018

4.    As of mid-June 2018, the Debtor owed the Banks *$95,919,458.71*[1]*,* with a loan portfolio value of $**124,938,505**, and M2M[2] valuation of **$102,829,518**.  In addition, since the Petition Date, the Debtor has made total payments to the Banks of **$7,826,551.44**, consisting of $5,693,203.45 in adequate protection and $2,133,347.99 in interest and fees. These payments have had an adverse impact on the Debtor's business to the detriment of all stakeholders.  Accordingly, and because the Banks are and will continue to be adequately protected, the Bank's adequate protection package must be reevaluated.  The appropriate focus for the Court in analyzing adequate protection is whether (1) the current equity cushion

---

[1] Balance of indebtedness as of June 13, 2018.

[2] M2M denotes mark to mark valuation of the Banks' collateral.

(approximately **$7,210,060**) taken together with the other forms of adequate protection provided to the Banks under the proposed budget and order (including new and replacement liens), and (2) the increase in the Banks' *net* equity cushion by an additional **$7,143,342,** over the next 12 weeks[3] pursuant to the proposed budget attached hereto (see below), such that the Banks will have over **$14,353,402** or **over 14%** equity cushion, which is sufficient to protect the Banks' interest in the prepetition collateral.[4]

### *The Banks Received Over 7 Million Dollars In Adequate Protection: Taking All Available Cash, While Jeopardizing the Debtor's Business As A Going Concern*

5.      Through a series of Agreed Interim Cash Collateral Orders [ECF ## 36, 70, 111 and 125], the Banks received adequate protection payments in the total amount of **_$7,826,551.44_** *(as of June 13, 2018)*, in just over three (3) months.

6.      The Debtor was compelled by the Banks to initially stop its new loan originations: the heart and core of the Debtor's business operations, without which it may be difficult to survive as a going concern.

7.      The Initial Interim Cash Collateral Order [ECF # 36] permitted the Bank to collect interest payments, even though it prohibited the Debtor from underwriting new loans for a period of three weeks. This disruption in new loan origination caused the Debtor to lose certain sale channels (car dealerships from whom the Debtor acquired its new customers /loans), disrupting the well-established pipeline that the Debtor had worked to develop over the last 30 years.

8.      Taking all the available cash for the Banks, the second, third and fourth interim cash collateral orders revived the ability to underwrite new loans but also limited significantly

---

[3] The proposed budget begins on the week of July 1-7 (week 14), and therefore it is a 13-week budget. However, this Supplement is being filed on week 15, with 12-week remaining.

[4] During the period of the proposed budget, the Banks' gross equity cushion increases from $7.21 million to $16.1 million.  See Budget and FN # 7.

the Debtor's flexibility, including capping them at 35 new loan deals per week, whereas pre-Petition the Debtor had generated over 75 new loans per week. In the context of the Debtor's business, this represents a substantial reduction in loan originations.

9.     Due to the initial sudden stop in loan originations, and then the slow increase in new loan deals agreed to by the Banks, the Debtor is presently required to engage in a hit or miss reconnection with its sales channel relationships instead of what used to be – but still can be in the future – a steady and reliable source of new loans.

10.     The sales channel relationship restoration and increase of new loans to historical levels is challenging, however, given the Debtor's sudden post-petition cessation of business with the car dealerships, and the limited number of new loans the Debtor can access with only one salesman.

11.     Limiting the number of sales people and territories covered and the writing of new loans has caused the Debtor to deny certain dealerships new loan origination when they would otherwise accept such loans when presented, relegating the Debtor to a "pick-and-choose" of new loan originations among the various dealerships with whom the Debtor historically transacted.  Accordingly, the Debtor's current new loan origination activity is not indicative of what the Debtor's business prospects would be if given the flexibility to return to a "full" sales channel. The proposed budget provides that flexibility.  If the Debtor is able to meet its projected new loan originations as permitted by the proposed budget, the Debtor believes such results will form a cornerstone for post-confirmation projections and a confirmable plan of reorganization.

12.     Another issue created by the limited number of deals is the reduced number of sales associates the Debtor is able to employ due to the limited financial incentive available for each of the associates. Pre-Petition, the Debtor employed five full time sale associates who were responsible for large metropolitan centers throughout the State of Florida (Miami-

Dade, Broward, Palm Beach, Jacksonville, Tampa, Pensacola and Orlando). Since their compensation structure is based on the number of deals (flat fee commission per transaction) they generate, each sales associate needs sufficient volume of deals to sell per month to make their efforts financially feasible.   Post-Petition and due to the low number of deals available, there is only ***one*** sales associate (who is responsible for Miami-Dade County).[5]

13.    Moreover, the Banks have insisted that any new loan originations be made at an eight percent (8%) discount rate.[6] Pre-Petition, the Debtor underwrote new loans with as low as a (3%) discount rate. This new rate hampers the Debtor's ability to be competitive in the marketplace. Again, this is further demonstration of a less than subtle effort by the Banks to impose arbitrary limitations on the proven business operations of the Debtor. This is a highly inefficient method of conducting business that has and continues to hurt the Debtor's business to the detriment of all stakeholders, including the Banks.

14.    Full restoration of the relationships lost would only be possible if the Debtor is permitted to reestablish prior sales channels and underwrite qualified loans at historical levels, without an artificial cap, and to underwrite such loans at any discount rate it believes in its business judgment is competitive in the marketplace.[7]

---

[5] Should the number of deals increase to normal levels, there are three (3) sales associates that have begun working, with a 30-day lead time to begin generating additional deals.

[6] The Banks have insisted that market discount rates are presently much higher, in the low "teens", while the Debtor, who has been operating in the marketplace for many years believes the rates are substantially lower.

[7] The Debtor understands the Banks are exiting the subprime auto loan sector of their lending businesses.  That being the Bank's business decision, that decision cannot be a basis to restrict or impede the Debtor's efforts to remain a viable concern and pursue a chapter 11 reorganization as a going concern.

**While the Debtor Collected Significant Cash Amounts, the Banks Benefited from it,
all at the Expense of the Debtor's Business and the Unsecured Creditors**

15.    Based on the value of the collateral as of the Petition Date and as of mid-June 2018, the Banks' collateral far exceeds the indebtedness amount, and thus the Bank is *greatly* over-secured by over $7 million.

16.    Even more so, the Banks' equity cushion continues to increase with each of the adequate protection payments that are made pursuant to the Fourth Interim Cash Collateral Order [ECF # 125] and with each loan that is allowed to be made, despite the low number and the unreasonable conditions being imposed.  As set forth in the revised Budget attached hereto, the Debtor's ability to underwrite new loans enhances the Banks' collateral position and, by extension, their equity cushion, which rises from 8 percent (8%) at present to as high as 17% by late September.[8]

17.    Given the nature of the Debtor's business, the continued diversion of the Debtor's free cash flow towards adequate protection payments instead of towards increasing the Debtor's loan portfolio will result in irreparable harm to the viability of the Debtor's business as a going concern. Absent replenishment of the Debtor's loan portfolio, over time, Debtor's revenue will decline given the natural decrease in payment streams associated with its loan portfolio, with a corresponding decline in the collateral base.

18.    As a result of the initial prohibition on new loans in the initial Interim Cash Collateral Order [ECF # 36] and the limited number of loans permitted to be underwritten pursuant to the second, third and fourth interim cash collateral orders [ECF # 70, 111, 125], as the Debtor has reduced the collateral base with its collection of existing loan payments,

---

[8] For example, pursuant to the proposed budget, the Debtor expects to generate approximately 240 new loan originations.  This would increase the value of the Debtor's loan portfolio (and the Banks' collateral) from $124,9238,505 to approximately $135,818,505, with a M2M value of approximately $111,784,205 at the end of the budget period.  This would improve the Banks' gross equity cushion to 17%.

the limited number of new loans the Debtor has been permitted to add has generated an insignificant amount of monthly payments. Should this situation persist, the Debtor is facing imminent irreparable injury to its business, at a time when it needs to present itself to potential takeout lenders in the best light, a light that is truly reflective of its business history and its business potential.  The alternative is a self-imposed liquidation where only the Banks stand to meaningfully recover any value.  This is not in the best interest of the Debtor or its other stakeholders.

**THE PROPOSED BUDGET WITHOUT CAPS TO NUMBER OF
LOAN ORIGINATIONS SHOULD BE APPROVED**

19.    In light of all of the foregoing facts, and specifically, the reduction of the Banks' indebtedness, the large sums of adequate protection paid to date, and the potential harm to the Debtor's business as a viable going concern, the Debtor requests this Court approve the proposed budget (which otherwise replaces the initial budget attached to the Motion) attached hereto as **Exhibit "A."**

20.    Although the proposed budget mostly adopts the expense basis included in the Fourth Interim Cash Collateral Order, it includes the following notable adjustments:

a.   Increases the projected revenue from collections by considering historical rates of collection during certain periods;

b.   Increases projected revenue associated with repossessions;

c.   Reduces payroll office expenses. The Debtor is engaged in an ongoing effort to reduce non-essential costs;

d.   Removes the cap to the number of deals made, and set them over the proposed period at 60 deals per week; and

e.   Pays interest only as one form of adequate protection payments in light of the current equity cushion enjoyed by the Banks.

21.     According to the proposed budget and analysis, as the Debtor initiates new loans (while the Banks receive replacement liens on those new loans), the Banks' equity above and beyond the indebtedness amount will further **increase** by at least 1% each week, thereby further protecting the Banks and providing them with additional adequate protection (by and through the replacement liens) of $**7,143,342 over a 12 week period**.[9]

22.     The current approach of restricting new loan originations is against the Banks' self-interest. The value of the "pipeline" is critical to the Debtor's continued ability to operate as a going concern, and for the benefit of the Banks and the unsecured creditors.

**WHEREFORE**, it is requested that this Court enter a final Order:

A.      Overruling the Objection filed by BOA;

B.      Approving the Debtor's use of cash collateral in accordance with a proposed budget, attached hereto as Exhibit "A."

---

[9] In returning the Debtor's business to historical levels by growing loan originations, the debtor will necessarily expend significant cash ($1,350,442), but at the same time, will increase the Banks' equity cushion by more than **$7,143,342** on a net basis, as set forth on page 3 of the Budget attached as **Exhibit "A"**, and as summarized below:

| | July 7, 2018 | August 11, 2018 | September 29, 2018 |
|---|---|---|---|
| **Loan Portfolio with New Loans** | $125,498,505 | $129,098,505 | $135,818,505 |
| **Banks' Loan Balance** | $95,619,458 | $95,619,456 | $95,619,458 |
| **M2M Valuation** | $103,290,421 | $106,253,369 | $111,784,205 |
| **Equity Cushion** | $7,670,963 | $10,633,911 | $16,164,747 |
| **% Equity Cash Cushion** | 8% | 11% | 17% |
| **Ending Cash Balance** | $2,136,864 | $2,248,434 | $786,422 |

Accordingly, the Banks' collateral position, on a **net** basis improves by an additional **$7,143,342** over the 12-week budget period. Please note that the Banks' balance is reflective of the mid-June 2018 amount, and has otherwise been reduced since then. Also see Chart demonstrating the increase in collateral position, attached hereto as **Exhibit "B."**

Equity cushion increase of **$8,493,784** ($16,164,747 less $7,670,963 = $8,493,784); Cash balance decrease of **$1,350,442** ($2,136,864 less $786,422 = $1,350,442); Net improvement in collateral of **$7,143,342** ($8,493,784 less $1,350,442 = $7,143,342).

The Debtor anticipates further increases in ending cash balance upon confirmation of forthcoming proposed plan of reorganization and exit from bankruptcy. Following a possible confirmation of a plan, approximately $354,856 per month in Chapter 11 administrative expenses will be eliminated from the budget, and the Debtor expects further costs savings through refinancing of the Banks' debt.

C.      Ordering and Directing BOA to immediately turnover all the funds in the lock-

box funds described in ECF# 126; and

D.      Granting such other and further relief as may be just and proper.

Dated: July 10, 2018                    LEIDERMAN SHELOMITH ALEXANDER
                                        + SOMODEVILLA, PLLC
                                        Counsel for the Debtor
                                        2699 Stirling Road, Suite C401
                                        Ft. Lauderdale, Florida 33312
                                        Telephone: (954) 920-5355
                                        Facsimile:   (954) 920-5371

                                        By:_____/s/_____
                                                ZACH SHELOMITH
                                                Florida Bar No. 122548
                                                zbs@lsaslaw.com
                                                IDO J. ALEXANDER
                                                Florida Bar No. 51892
                                                ija@lsaslaw.com

                            **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing motion was served on
July 10, 2018, to all parties on the list to receive e-mail notice/service for this case, via the
Notice of Electronic Filing (which is incorporated herein by reference).

                            By:_____/s/_____
                                    Ido J. Alexander

**Exhibit "A"**

**(Proposed Budget)**

**Summit Financial Corp.**
**Case No. 18-13389-BKC-RBR**
**United States Bankruptcy Court**
**Southern District of Florida**
**Fort Lauderdale Division**

## Summit Weekly Operating Cash Budget

Lazenby- Summit Financial Operating Budget

| Description | Note | July 1-7 Week 14 Budget | July 8-14 Week 15 Budget | July 15-21 Week 16 Budget | July 22-28 Week 17 Budget | July 29 – August 4 Week 18 Budget | August 5-11 Week 19 Budget | August 12-18 Week 20 Budget | August 19-25 Week 21 Budget | August 26 – September 1 Week 22 Budget | September 2-8 Week 23 Budget | September 9-15 Week 24 Budget | September 16-22 Week 25 Budget | September 23-29 Week 26 Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | 1 | 1,144,113 | 2,320,329 | 1,176,216 | 1,176,216 | 1,176,216 | 1,177,669 | 1,177,669 | 1,177,669 | 1,177,669 | 1,171,247 | 1,171,247 | 1,171,247 | 1,171,247 |
| **REVENUE SOURCES** | | | | | | | | | | | | | | |
| Estimated Loan Collections: | | | | | | | | | | | | | | |
| Interest Income | | 430,009 | 430,009 | 430,009 | 430,009 | 430,009 | 430,009 | 430,009 | 430,009 | 430,009 | 430,009 | 430,009 | 430,009 | 430,009 |
| New Originations Interest Income | 2 | 8,750 | 8,750 | 8,750 | 8,750 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Principal Collections | 3 | 555,174 | 555,174 | 555,174 | 555,174 | 550,571 | 550,571 | 550,571 | 550,571 | 548,105 | 548,105 | 548,105 | 548,105 | 548,105 |
| New Originations Principal Collections | 4 | 5,041 | 5,041 | 5,041 | 5,041 | 8,642 | 8,642 | 8,642 | 8,642 | 8,642 | 8,642 | 8,642 | 8,642 | 8,642 |
| Late Charges and Repo Charges | | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Collections on Accounts written off | | 147,242 | 147,242 | 147,242 | 147,242 | 143,447 | 143,447 | 143,447 | 143,447 | 139,492 | 139,492 | 139,492 | 139,492 | 139,492 |
| **Weekly Revenues** | | 2,320,329 | 1,176,216 | 1,176,216 | 1,176,216 | 1,177,669 | 1,177,669 | 1,177,669 | 1,177,669 | 1,171,247 | 1,171,247 | 1,171,247 | 1,171,247 | 1,171,247 |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | | |
| **Payroll & Benefits:** | 5 | | | | | | | | | | | | | |
| Payroll- Office | | 46,670.84 | 46,670.84 | 46,670.84 | 46,670.84 | 46,670.84 | 46,670.84 | 46,670.84 | 46,670.84 | 46,670.84 | 46,670.84 | 46,670.84 | 46,670.84 | 46,670.84 |
| Payroll- Partners | | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 |
| Payroll Taxes | | 7,050.59 | 7,050.59 | 7,050.59 | 7,050.59 | 7,050.59 | 7,050.59 | 7,050.59 | 7,050.59 | 7,050.59 | 7,050.59 | 7,050.59 | 7,050.59 | 7,050.59 |
| Employee Benefits | | | 33,300.00 | | | | 33,300.00 | | | | | 33,300.00 | | |
| **Weekly Payroll Costs** | | 70,721 | 104,021 | 70,721 | 70,721 | 70,721 | 104,021 | 70,721 | 70,721 | 70,721 | 70,721 | 104,021 | 70,721 | 70,721 |
| **Direct Expenses** | 6 | | | | | | | | | | | | | |
| Commissions | | 4,375 | 4,375 | 4,375 | 4,375 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| Credit Reporting | | 10,750 | | 5,500 | 6,750 | 10,750 | | 5,500 | 6,750 | 10,750 | | 5,500 | 6,750 | 6,750 |
| Data Processing | | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 |
| **Weekly Direct Expenses** | | 42,125 | 31,375 | 36,875 | 38,125 | 45,250 | 34,500 | 40,000 | 41,250 | 45,250 | 34,500 | 40,000 | 41,250 | 41,250 |
| **Operating Expenses** | 7 | | | | | | | | | | | | | |
| Auto Expenses | | | | | 200 | | | | 200 | | | | 200 | 200 |
| Bank Charges / Credit Card Processing Fees | | | | | 30,000 | | | | 30,000 | | | | 30,000 | 30,000 |
| Dues and Subscriptions | | | | | 1,500 | | | | 1,500 | | | | 1,500 | 1,500 |
| Equipment Leasing | | | | | 900 | | | | 900 | | | | 900 | 900 |
| General Insurance | | 400 | | | | 400 | | | | 400 | | | | |
| Legal and Professional | | | | 10,000 | | | | 10,000 | | | | 10,000 | | |
| Licenses, Taxes & Tag Fees | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Repo Fees & Repo Titles | | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 |
| Travel, Meals and Entertainment | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Office Expenses | | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 |
| Postage | | | | | 1,000 | | | | 1,000 | | | | 1,000 | 1,000 |
| Rent | | 25,000 | | | | 25,000 | | | | 25,000 | | | | |
| Utilities | | | 12,000 | | | | 12,000 | | | | 12,000 | | | |
| Telephone | | 3,950 | | | 5,500 | 3,950 | | | 5,500 | 3,950 | | | 5,500 | 5,500 |
| **Weekly Operating Expenses** | | 57,550 | 40,200 | 38,200 | 67,300 | 57,550 | 40,200 | 38,200 | 67,300 | 57,550 | 40,200 | 38,200 | 67,300 | 67,300 |


Lazenby & Associates
a risk management group

**Summit Financial Corp.**
**Case No. 18-13389-BKC-RBR**
**United States Bankruptcy Court**
**Southern District of Florida**
**Fort Lauderdale Division**

## Summit Weekly Operating Cash Budget

Lazenby- Summit Financial Operating Budget

| Description | Note | July 1-7 Week 14 Budget | July 8-14 Week 15 Budget | July 15-21 Week 16 Budget | July 22-28 Week 17 Budget | July 29-August 4 Week 18 Budget | August 5-11 Week 19 Budget | August 12-18 Week 20 Budget | August 19-25 Week 21 Budget | August 26-September 1 Week 22 Budget | September 2-8 Week 23 Budget | September 9-15 Week 24 Budget | September 16-22 Week 25 Budget | September 23-29 Week 26 Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Chapter 11 Administrative Fees and Costs** | 8 | | | | | | | | | | | | | |
| Case Administrative Costs | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Professional Fees - Legal / Accounting | | 22,000 | 22,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 |
| Chapter 11 Committee Professionals | | 30,000 | 30,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 |
| Quarterly US Trustee Fees | | 35,714 | 35,714 | 35,714 | 35,714 | | | | | | | | | |
| **Weekly Chapter 11 Costs** | | 88,714 | 88,714 | 98,714 | 98,714 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 |
| **Total Weekly Expenses** | | 259,111 | 264,311 | 244,511 | 274,861 | 236,521 | 241,721 | 211,921 | 242,271 | 236,521 | 208,421 | 245,221 | 242,271 | 242,271 |
| New Loan Origination Funding/Net Funding | | 560,000 | 560,000 | 560,000 | 560,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 |
| # New Loan Originations | | 35 | 35 | 35 | 35 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| New Loan Origination Funding/Net Funding | | 560,000 | 560,000 | 560,000 | 560,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 |
| **Weekly Funding Disbursements** | | 560,000 | 560,000 | 560,000 | 560,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 |
| Monthly New Loans | | | | | | | | | | | | | | |
| **Portfolio of New Originations** | | 560,000 | 1,120,000 | 1,680,000 | 2,240,000 | 3,200,000 | 4,160,000 | 5,120,000 | 6,080,000 | 7,040,000 | 8,000,000 | 8,960,000 | 9,920,000 | 10,880,000 |
| **Net Weekly Cash Flow W/O Originations** | | 2,061,218 | 911,905 | 931,705 | 901,355 | 941,147 | 985,947 | 985,947 | 935,397 | 934,726 | 962,826 | 926,026 | 928,976 | 928,976 |
| **Net Weekly Cash - W/New Originations** | | 1,501,218 | 351,905 | 371,705 | 341,355 | (18,853) | (24,053) | 5,747 | (24,603) | (25,274) | 2,826 | (33,974) | (31,024) | (31,024) |
| Beginning cash - Operating and AP Account | | | | | | | | | | | | | | |
| Beginning cash - Collection Account | | 824,887 | 2,136,864 | 2,299,528 | 2,481,992 | 2,634,107 | 2,426,013 | 2,212,720 | 2,029,226 | 1,815,383 | 1,600,868 | 1,414,453 | 1,191,238 | 970,973 |
| Net Weekly Cash - W/New Originations | | 1,501,218 | 351,905 | 371,705 | 341,355 | (18,853) | (24,053) | 5,747 | (24,603) | (25,274) | 2,826 | (33,974) | (31,024) | (31,024) |
| Interest Expense | | (189,241) | (189,241) | (189,241) | (189,241) | (189,241) | (189,241) | (189,241) | (189,241) | (189,241) | (189,241) | (189,241) | (189,241) | (189,241) |
| *Ending Cash - Collection Account* | | 2,136,864 | 2,299,528 | 2,481,992 | 2,634,107 | 2,426,013 | 2,212,720 | 2,029,226 | 1,815,383 | 1,600,868 | 1,414,453 | 1,191,238 | 970,973 | 750,708 |



Lazenby & Associates
a risk management group

**Summit Financial Corp.**
**Case No. 18-13389-BKC-RBR**
**United States Bankruptcy Court**
**Southern District of Florida**
**Fort Lauderdale Division**

## Summit Weekly Operating Cash Budget

Lazenby– Summit Financial Operating Budget

| Description | Note | July 1-7 Week 14 Budget | July 8-14 Week 15 Budget | July 15-21 Week 16 Budget | July 22-28 Week 17 Budget | July 29 – August 4 Week 18 Budget | August 5-11 Week 19 Budget | August 12-18 Week 20 Budget | August 19-25 Week 21 Budget | August 26-September 1 Week 22 Budget | September 2-8 Week 23 Budget | September 9-15 Week 24 Budget | September 16-22 Week 25 Budget | September 23-29 Week 26 Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Adequate Protection Analysis 6/20/2018** | | | | | | | | | | | | | | |
| *Existing Summit Loan Portfolio* | | 124,938,505 | | | | | | | | | | | | |
| Loan Portfolio With New Originations | | 125,498,505 | 126,058,505 | 126,618,505 | 127,178,505 | 128,138,505 | 129,098,505 | 130,058,505 | 131,018,505 | 131,978,505 | 132,938,505 | 133,898,505 | 134,858,505 | 135,818,505 |
| *Bank of America loan Balance (Debt)* | | 95,619,458 | 95,619,458 | 95,619,458 | 95,619,458 | 95,619,458 | 95,619,458 | 95,619,458 | 95,619,458 | 95,619,458 | 95,619,458 | 95,619,458 | 95,619,458 | 95,619,458 |
| Adequate Coverage Ratio | | 82.3% | | | | | | | | | | | | |
| *Blended M2M Valuation* | | 103,290,421 | 103,751,324 | 104,212,227 | 104,673,130 | 105,463,250 | 106,253,369 | 107,043,489 | 107,833,608 | 108,623,727 | 109,413,847 | 110,203,966 | 110,994,086 | 111,784,205 |
| **Excess Spread (Adequate Protection $$)** | | 7,670,963 | 8,131,866 | 8,592,769 | 9,053,672 | 9,843,792 | 10,633,911 | 11,424,031 | 12,214,150 | 13,004,269 | 13,794,389 | 14,584,508 | 15,374,628 | 16,164,724 |
| Excess Spread (Adequate Protection) | | 8% | 9% | 9% | 9% | 10% | 11% | 12% | 13% | 14% | 14% | 15% | 16% | 17% |

**Adequate Protection Analysis 6/20/2018**

| Petition Date 3/23/2018 | 3/23/2018 | 6/20/2018 | Note |
|---|---|---|---|
| *Existing Summit Loan Portfolio* | 134,099,226 | 124,938,505 | |
| *Bank of America loan Balance (Debt)* | 101,312,662 | 95,619,458 | |
| Adequate Coverage Ratio | | | |
| *Blended M2M Valuation* | 112,254,477 | 102,829,518 | 9 |
| **Excess Spread (Adequate Protection $$)** | 10,941,815 | 7,210,060 | |
| Excess Spread (Adequate Protection) | 10.8% | 8% | |

| | |
|---|---|
| Blended M2M Valuation | 82.3% |
| Average New Loan UPB | $ 16,000.00 |
| Bank rate | 0.095 |
| Principal Note Balance | 95,619,458 |
| New loan Originations Over 13 Weeks | 10,880,000 |



Lazenby & Associates
a risk management group

**Exhibit "B"**

**(Adequate Protection Chart)**



